AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

2019 NOV 27  AM 9: 50

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A Cellular Telephone Assigned Call Number<br>(937) 409-2273, With International Mobile Subscriber<br>Number 310410075322809 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  3:19 mj 684

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
SEE ATTACHMENT A.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*
SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Distribution of a controlled substance |
| 21 U.S.C. 846 | Conspiracy to distribute a controlled substance |
| 21 U.S.C. 843(b) | Use of a communications facility to commit a felony |

The application is based on these facts:
See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of   30   days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Task Force Officer Andy J. Leininger, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  11-27-19

_____
*Judge's signature*

City and state:  Dayton, Ohio

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 409-2273, WITH INTERNATIONAL MOBILE SUBSCRIBER NUMBER 310410075322809 | Case No. _____ **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Andy J. Leininger, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of a cellular telephone assigned call number (937) 409-2273, with International Mobile Subscriber Identity ("IMSI") number 310410075322809, placed in the subscriber name of Luis Arturo Fuentes with an address of 601 Acadia Court, Troy, Ohio, 45373 (hereinafter referred to as "**Target Telephone**"), whose service provider is AT&T, a wireless telephone service provider. The **Target Telephone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     Your Affiant is a Task Force Officer with the United States Drug Enforcement Administration (DEA), which is an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation.

3.     I am a law enforcement officer employed by the Miami County Sheriff's Office since February 2013, and currently assigned as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA), Dayton Resident Office.  During my career, I have conducted and participated in complex drug trafficking investigations which have resulted in arrests; execution of search warrants that resulted in the seizure of narcotics, narcotics proceeds and other evidence of narcotics trafficking activities; and supervised the activities of confidential sources (CS) who have provided information and assistance resulting in narcotics purchases. Through training and experience, your Affiant is aware that drug traffickers often communicate with their customers, couriers, and/or associates through the use of standard hardline telephones, cellular telephones and digital display paging devices, or use of multiple telephones or other devices, to avoid detection by law enforcement.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841 (distribution of a controlled substance and conspiracy to commit the same); and 21 U.S.C. § 843(b) (use of a communications facility to commit a felony) have been committed, are being committed, and will be committed by an individual utilizing the **Target Telephone**. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

2

## PROBABLE CAUSE

6.      Your Affiant submits, based on the facts below, that there is probable cause to believe that the **Target Telephone**, as described above, is being utilized by Luis Arturo Fuentes, in relation to violations of Title 21, United States Code, Section 846 and 841(a).

7.      On February 1, 2018, and again on June 19, 2018, DEA and Miami County law enforcement personnel debriefed a cooperating defendant (hereafter referred to as the "CD") in Troy, Ohio, regarding Fuentes.  The CD was again debriefed on May 15, 2019, and May 24, 2019, by law enforcement.[1]

8.      The CD stated that in 2008 he/she was introduced to Luis Arturo Fuentes.  The introduction to Fuentes was strictly intended for the CD to be utilized in Fuentes' drug trafficking operation. The CD stated that he/she worked as a money courier for Fuentes from 2008 to 2013. The CD also assisted with coordinating drug shipments from Mexico to Fuentes. The CD's job in coordinating the shipments was to ensure that the correct number of quantitative kilogram drugs were delivered, and the correct amount of U.S. currency was paid for the shipment. The CD stated that from 2008 to 2013, Fuentes was receiving approximately 10 to 12 kilograms of cocaine per week, and 5 to 6 kilograms of heroin per week.

---

[1] CD has been convicted of drug trafficking and money laundering related offenses.  The CD cooperated for consideration in his judicial case discussed in paragraph 9 below.  The CD's information provided to law enforcement has been corroborated by investigators as discussed herein and the CD is deemed to be truthful and credible.

9.     The CD stated Fuentes would pay the CD $1,000.00 or $2,000.00 each time he/she moved money for Fuentes. The CD stated that the last time he/she picked up money for Fuentes was approximately December 2013. The working relationship ceased between the CD and Fuentes due to the CD being the focus of a large scale drug trafficking investigation in Miami County, which ultimately resulted in the CD's incarceration.

10.     The CD stated that from 2008 to 2013, he/she met with Fuentes several times at the La Fiesta Mexican Restaurant, located at 836 W. Main St., Troy, Ohio, to collect money. The CD would also travel to various properties throughout Miami County, Ohio, namely the city of Troy, to collect money from properties owned by Fuentes. The locations were said to be rental properties, which also served as stash houses for illegal drugs and money obtained from drug trafficking. After collecting the money, the CD would transport the U.S. currency to money couriers, and/or other locations within the Dayton, Ohio, area, where the money would ultimately be physically and/or electronically sent to Mexico.

11.     The CD provided further details about the stash house properties in Troy, Ohio, owned by Fuentes. The CD estimated that in 2008 he/she collected in excess of $1,000,000 from 100 Harrison St. Through the numerous years the CD collected money from Fuentes, he/she identified 100 Harrison St. as being where money was collected the most. Additionally, the CD also recalled collecting money from 1020 W. Main St., and 228 Madison Ave. The CD claimed Fuentes was known to rotate between which rental properties he would store drugs and money in. This was meant to be a deterrent for law enforcement in detecting the illegal activities Fuentes was involved with. The CD stated that it was common for the properties to contain

$150,000 to $200,000 in them at any one time. When the CD would collect drug proceeds from La Fiesta Mexican Restaurant, it would typically be in $60,000 to $80,000 increments.

12.     The CD stated that, in 2011 or 2012, he/she was with Fuentes at a house located at 100 Harrison St., Troy, Ohio. While at the house, the CD observed a large amount of heroin and cocaine, which were packaged in kilogram quantities. The CD estimated that he/she saw 50 of the kilogram quantity bundles of the drugs. The CD also said approximately $1,500,000 was at the location as well.

13.     The CD provided information about individuals involved with Fuentes and his drug trafficking organization. The CD identified Rafael Barrera, Jose Serna, Pilar Serna, Daniel Delgado and Hugo Cesar Sanchez-Lomeli, as Fuentes' organizational subordinates. The CD stated that Fuentes would travel to Mexico once every month or two and meet with his superior(s) in the Mexican based drug trafficking organization. Fuentes would obtain details about future drug shipments destined for the Ohio region. Fuentes would then travel back to Ohio and meet with the individuals listed above. During the meetings, Fuentes would instruct the individuals about the drug shipment details. The CD was occasionally present during these meetings.

14.     On July 23, 2018, DEA and Miami County law enforcement personnel conducted a debrief with a DEA Confidential Source (hereafter referred to as CS1) in Beavercreek, Ohio.[2]

_____

[2] CS1 has a criminal history including drug trafficking and drug possession. CS1 was working with law enforcement for judicial consideration. CS1 has provided information in the past that has led to arrests and seizures in prior DEA investigations. CS1 is therefore deemed to be truthful and credible.

CS1 stated he/she regularly goes to La Fiesta Mexican Restaurant, which Fuentes owns. CS1 stated that when Fuentes would get drunk, he would brag about how much money he has. According to CS1, CS1 was at La Fiesta on May 5, 2018, and Fuentes was intoxicated. CS1 was in the parking lot with Fuentes, and was looking at the Audi sports car Fuentes owns. Fuentes bragged to CS1 there were only two of that particular model Audi made, and Fuentes owned one. CS1 and Fuentes joked about how much money Fuentes must really have. CS1 said Fuentes then opened the trunk of the Audi, and showed CS1 a duffle bag. Fuentes opened the duffel bag and showed CS1 a large amount of U.S. currency, speculated by CS1 to be at least $100,000.00.

15.    In approximately June of 2018, CS1 reported that he/she was at La Fiesta Mexican Restaurant, drinking at the bar. CS1 provided information about a conversation he overheard between a Hispanic employee, only known by CS1 as "Poncho," and another male by the name of "Tiny" McCoy. According to CS1, Poncho told McCoy there were "bricks of heroin" hidden in the walls of a house Fuentes owned, which had been condemned by the city of Troy. Poncho described the house as being located across the street from the Lincoln Community Center. Poncho further stated that after the house had been condemned, "they" had to break back into the house and retrieve the kilograms of heroin from the walls. A records check of the local law enforcement data base showed the address of 105 Ash St., which is owned by Fuentes, was condemned by the city of Troy around the same time period. The location of the residence is across the street from the Lincoln Community Center, matching the information provided by CS1.

16.     In May of 2019, DEA and Miami County law enforcement personnel interviewed a Miami County confidential source (herafter referred to as CS2).[3]  CS2 provided information about the drug trafficking organization he/she was a member of.  CS2 worked for ABA Auto Sales, which is located on N. Dixie Dr. in Dayton Ohio, is currently owned/operated by Aracely Estrada, and was operated by Estrada's husband, Rafael Barrera, until September 2018, when Barrera was arrested on federal drug charges, as discussed further below.  CS2 was an employee for the car dealership since 2013-2014.  Initially, CS2 performed menial tasks of washing and detailing cars for Barrera.  In 2015, Barrera entrusted CS2 to perform other tasks for him.  CS2 began wiring drug proceeds through electronic money remitting services, such as Western Union and MoneyGram.  In 2017, CS2 began assisting with the drug trafficking operation Barrera was involved with.  CS2 said Barrera would receive drug shipments into the car dealership.  The drugs would then be disbursed into the local drug markets through CS2, and other employees of ABA Auto Sales.  CS2 stated Barrera would receive various types of drugs from numerous Mexican-based drug trafficking organizations.  The drugs typically consisted of methamphetamine, heroin, fentanyl and cocaine.  CS2 was uncertain which Mexican drug cartel(s) Barrera worked for, but he/she did mention that on numerous occasions Fuentes would meet with Barrera at the car dealership.  Once the meeting with Fuentes was completed, Barrera would then tell CS2 they were going to "get busy."  CS2 clarified that this meant a drug

---

[3] CS2 has a criminal history including drug trafficking and drug possession.  CS2 has provided information in the past that led to the identification and arrest of individuals associated with drug trafficking.  CS2 is therefore deemed to be truthful and credible.

shipment would be coming in the near future. The drug shipments would then usually arrive within a month of Barrera meeting with Fuentes. CS2 continually trafficked illegal drugs for Barrera up until Barrera was arrested on September 10, 2018, by the Miami Valley Bulk Smuggling Task Force for his involvement in a drug trafficking investigation, which was conducted in the summer of 2018. CS2 said the meetings between Barrera and Fuentes, and drug shipments, continued all the way up until Barrera was arrested. Barrera is currently pending trial in federal court for violations of 21 U.S.C. § 846 and 841(b)(1)(A), conspiracy to possess with intent to distribute and to distribute 400 grams or more of fentanyl, a Schedule II controlled substance.

17. Fuentes has been found to own and operate at least five Mexican food restaurants. Four of the restaurants are located in Ohio, and the fifth is located in the Chicago, Illinois area. Along with the restaurants, Fuentes owns numerous rental properties in the Troy and Piqua, Ohio areas. Miami County Auditor records list Luis Arturo Fuentes and his company, La Fiesta Inc. as owning numerous properties in Troy Ohio to include: 1020 W. Main St., 100 Harrison St., 228 Madison St., and 101, 103, 105 Ash St. The investigation has shown many of the rental properties are occupied by La Fiesta employees and/or family members of Fuentes. Based on training and experience, your Affiant knows large scale drug traffickers operate cash businesses, such as restaurants and rental properties, in order to launder money.

18. Physical surveillance of rental properties owned by Fuentes has resulted in investigators obtaining discarded trash from the properties. On numerous occasions in the past year, investigators have obtained trash, which was placed at the curb awaiting collection from the Troy Municipal Waste Department. Investigators focused trash collection efforts on 101,103,

8

105 Ash St., 100 Harrison St. and 228 Madison St.    As discussed below, searches of the discarded items at these addresses has resulted in the discovery of plastic bags and other items containing residual white powdered substance.  The items field tested positive for cocaine, using cobalt thiocyanate.  Some of the items were sent for testing at the Miami Valley Regional Crime lab and test results were positive for cocaine.  The following list highlights recent dates and items found by investigators in the trash.

19.     On October 2, 2019, investigators obtained trash from 101 Ash St.  Items recovered included an airline luggage tag for Luis Fuentes, dated September 16, 2019.  A plastic bag containing a white powdered residue was also recovered.  The plastic bag was sent to the Miami Valley Regional Crime Lab and tested positive for cocaine.    Trash was again obtained on October 9, 2019, from 101 Ash St.  Items recovered included a dry cleaning slip for Luis Fuentes and again a plastic bag containing a white powdered residue.  The item was field tested using cobalt thiocyanate and tested positive for cocaine.

20.     Investigators obtained trash from 100 Harrison St. on October 1, 2019, and September 24, 2019.  Items recovered on October 1, 2019, included a Sprint phone bill for Bryan Fuentes, whom is known to reside at 100 Harrison St., based on surveillance.  Bryan Fuentes is the brother of Fuentes.  Additionally, a plastic bag containing a white powdered residue was recovered, which later tested positive for cocaine at the Miami Valley Regional Crime Lab. Trash obtained on September 24, 2019, contained pay stubs for Bryan Fuentes from La Fiesta Mexican Restaurant, as well as five plastic bags with white powdered residue.  The plastic bags were again sent to the Miami Valley Regional Crime Lab and tested positive for cocaine.

21.     Trash has also been obtained from 228 Madison Ave.  On July 30, 2019, investigators obtained trash from the residence, which contained plastic bags with white powdered residue.  These items tested positive for cocaine at the Miami Valley Regional Crime Lab.

22.     The 228 Madison St. residence is currently occupied by workers for La Fiesta Mexican Restaurant.  One of the occupants of the residence has been identified through the investigation as Julian Tamayo-Ruiz, whom is employed at La Fiesta Mexican Restaurant.  228 Madison St. is listed as Tamayo-Ruiz's address based on local law enforcement records, and surveillance conducted by investigators has shown him at the location regularly.  The CD has identified Tamayo-Ruiz as a drug courier.  On July 13, 2019, another Miami County Confidential Source (herafter referred to as CS3)[4] was hanging out with Tamayo-Ruiz.  According to CS3, CS3 had picked up Tamayo-Ruiz from 228 Madison St. and took him to a hotel in Piqua, Ohio, to party.    Conversation ensued between CS3 and Tamayo-Ruiz wherein CS3 inquired about buying large amounts of illegal drugs through Tamayo-Ruiz.  Tamayo-Ruiz informed CS3 he could arrange for a large shipment of drugs to be sent to CS3 from "his people."  Tamayo-Ruiz made a phone call to an unidentified Spanish speaking male and conducted a conversation on speaker phone between CS3, Tamayo-Ruiz and the male.  CS3 called your Affiant from his/her personal phone and allowed your Affiant to listen to the open call CS3 was participating in.  Your Affiant was able to record the conversation as it was occurring.  The conversation consisted of CS3 asking the unknown male about prices of cocaine.

---

[4] CS3 has a criminal history including drug trafficking and drug possession.  CS3 was assisting law enforcement for financial consideration.

The male requested CS3 to travel to Chicago to obtain the drugs.  CS3 declined to travel that distance.  The conversation continued and Tamayo-Ruiz advised a large drug shipment would be coming to Troy, Ohio in the near future.

23.     Through phone toll analysis, investigators were able to determine that Tamayo-Ruiz's phone has been in contact with Fuentes phone, the **Target Telephone**.  Specifically, Tamayo-Ruiz was in contact with the **Target Telephone** four times on April 4, 2018, once on February 20, 2019, and once on June 21, 2019.

24.     Physical and electronic surveillance of Fuentes has provided details to investigators that Fuentes is still actively participating in suspicious criminal behavior.  Fuentes travels to Mexico on a regular basis.  Border crossing information shows Fuentes has traveled to Mexico at least eight times in the past year.  The volume of border crossings in Mexico align with the CD's claim that Fuentes regularly travels to Mexico to meet with cartel members.

25.     Recently on September 6, 2019, Fuentes returned to Ohio from Mexico.  Surveillance was conducted on Fuentes upon his return to Troy, Ohio.  Investigators observed suspicious activity involving Fuentes and the property he owns at 101 Ash. St.  This location is where investigators have obtained discarded trash within the past 60 days, which contained items with cocaine residue, as discussed in paragraph 19 above.  In the past month, investigators have observed Fuentes frequently visiting this location.  The residence is a multi-unit rental property.  The back unit, which Fuentes entered, has appeared to be vacant in the recent months of July and August 2019.  On occasion, Hispanic workers from La Fiesta have been surveilled walking to and from the back unit apartment, but not on a regular basis.

11

26.     On September 8, 2019, Fuentes was observed driving his black Mercedes SUV and arrived to 101 Ash St., around 1:00 a.m.  Fuentes was observed going into the back of the residence.  Fuentes left the location around 11:40 a.m. on September 8, 2019.  During the period Fuentes was at the apartment, no other individuals were observed coming or going from the location.  Fuentes returned to the location approximately 1 hour later and retrieved what appeared to be a small bag from the cargo area of his Mercedes SUV, and then went inside the back of the apartment.  Fuentes exited the apartment approximately 5 minutes later, and left in his vehicle.  Around 3:43 p.m. on the same date, Fuentes arrived back at the location, wearing different clothing.  Fuentes retrieved a suitcase and 2 duffle bags from the rear cargo area of his SUV, and once again, entered the back of the building.  Approximately a half hour later, Fuentes exited the location, carrying a white bag, which did not match any of the luggage he carried in previously.

27.     Fuentes arrived back at the 101 Ash St. location on September 9, 2019, at around 12:30 a.m.  He was at the location for a few hours and left around 7:00 a.m.  Fuentes again returned to 101 Ash St. around 9:15 a.m.  Fuentes left the location again around 9:37 a.m.   Later in the day of September 9, 2019, an individual identified herein as E.T. was observed arriving at 101 Ash St. around 8:30 p.m.  E.T. exited her Honda Odyssey minivan and carried a bag type item into the rear apartment of 101 Ash. St.  E.T. was then observed leaving a few minutes later with nothing in her hands.  Surveillance was able to determine no one else was present at this location, during the time frame E.T. was there.

28.     E.T. was identified by the CD as an employee for La Fiesta Mexican Restaurant who assists Fuentes with his illegal drug trafficking activities.  The CD stated he/she collected

drug proceeds from E.T. numerous times until 2013. E.T. was said to regularly hide cash for

Fuentes until it is collected and sent back to Mexico. Investigators have confirmed through

surveillance that E.T. is an employee of La Fiesta and has regular contact with Fuentes.

29.     On September 10, 2019, Fuentes was again observed arriving at 101 Ash. St.

around 7:46 p.m. Fuentes went inside the apartment and left a short time later carrying a paper

binder and one of the duffle bags he delivered a few days prior. Fuentes loaded the bag into the

cargo area of his SUV and left the location. Based on training, experience, and information

obtained during this investigation, it is believed Fuentes is actively using 101 Ash St. as one of

the locations he is storing drugs and/or drug proceeds.

30.     Toll analysis over the last year has shown the **Target Telephone** in regular

contact with Jose Serna, whom currently utilizes cellular telephone 937-571-9910. Phone

records show that 937-571-9910 is subscribed in Jose Serna's name. Toll records show that

between March 4, 2019, and September 28, 2019, there have been 201 contacts between Serna

and the **Target Telephone**. As provided by the CD, Serna works with Fuentes to distribute

drugs and assists in Fuentes' drug trafficking and money laundering operations. The CD stated

that Serna was present when Fuentes would meet with Rafael Barrera and others to discuss drug

trafficking, as discussed in Paragraphs 10-13 above. The CD stated that Jose Serna would

transport drug proceeds to Mexico on behalf of Fuentes. Border crossing records reviewed by

law enforcement show that Serna crossed the Mexican border at least 45 times in 2018 and 2019.

Serna is also a known family member of Rafael Barrera, who is currently incarcerated in relation

to a federal drug investigation, as stated in paragraph 16 above.

31.     Your Affiant conducted a law enforcement query of Luis Arturo Fuentes and observed that he has an active Ohio driver's license with his home address listed as 601 Acadia Court, Troy, Ohio. Your Affiant also conducted a local law enforcement query of the Miami Count,y Ohio reporting system, and observed that Luis Arturo Fuentes provided law enforcement with the **Target Telephone** as his current telephone number on August 17, 2018, during a traffic accident investigation.

32.     Your Affiant received a response from AT&T pursuant to subpoena.  The response listed Luis A Fuentes as the subscriber of the **Target Telephone**, at the address 601 Acadia Court, Troy, Ohio. The subscriber information received pursuant to this subpoena also showed that the **Target Telephone** had been subscribed to Luis A Fuentes since March 26, 2013.

33.     On November 1, 2019, your Affiant obtained a search and seizure warrant for the electronic monitoring of GPS locational services of the **Target Telephone**.  The warrant was signed and issued by U.S. Magistrate Judge Sharon L. Ovington, of the United States District Court for the Souther District of Ohio.  The warrant was executed on the same date, and investigators began reciving locational data of the **Target Telephone**.

34.     Investigators utilized physical and electronic surveillance on Fuentes and the **Target Telephone**. Physical surveillance showed Fuentes to be at the same locations as the electronic data being obtained from the **Target Telephone**.  The surveillance showed a high frequency of Fuentes going to the property he owns of 101, 103, and 105 Ash St., between November 1, 2019, and November 25, 2019.  Due to the frequency of Fuentes going to the location of these properties, detectives from the Miami County Sheriff's Office conducted

14

physical surveillance on the location on November 20, 2019. During the surveillance period, a large plastic trash can was observed sitting at the curb in front of the properties, awaiting collection from the Troy Municipal Waste Department. The contents of the trash can were removed and transported back to a secure location to be examined. Upon detectives examining the contents, 6 partial plastic bags were located with a white powdered residue inside them. The residue was field tested using cobalt thiocyanate and the result of the presumptive test was positive for cocaine. It should be noted, Fuentes was observed at the location of these properties numerous times on November 19, 2019.

35.     In summary, your Affiant believes the **Target Telephone** is currently being used by Luis Arturo Fuentes during the coordination of criminal activities involving the trafficking and conspiracy to traffic drugs. Based on the information developed in this case, your Affiant believes through tracking the location of **Target Telephone,** investigators will be able to obtain additional information in regards to Fuentes's criminal activity. Learned travel patterns from international flights, local travel and social media posts show that Fuentes frequently travels with no discernable pattern. Fuentes also owns multiple vehicles and utilizes them in no discernable pattern.

36.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data

15

provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data**.**

37.     Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available.

38.     Based on my training and experience, I know that AT&T can collect cell-site data about the **Target Telephone**.

## **AUTHORIZATION REQUEST**

39.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

40.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified

because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2)

41.    I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

42.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephone** outside of daytime hours.

43.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Andy J. Leininger
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this 27th day of November, 2019.

HON. SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### Property to Be Searched

1. A cellular telephone assigned call number, (937) 409-2273, with International Mobile Subscriber Identity ("IMSI") number 310410075322809 ("**Target Telephone**"), whose wireless service provider is AT&T, a company headquartered at 11760 U.S. Highway 1, Suite 600, North Palm Beach, FL 33408.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of AT&T, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Telephone** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the **Target Telephone** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).